UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

SANDRA HABERMEHL,

        Plaintiff,

v.                                  Case No.  5:07-cv-361-Oc-GRJ

MICHAEL J. ASTRUE, Commissioner of Social
Security,

        Defendant.

_____

## ORDER

Plaintiff appeals from a final decision of the Commissioner of Social Security ("the Commissioner") denying her application for a period of disability and disability insurance benefits. (Doc. 1.) The Commissioner has answered (Doc. 4), and both parties have filed briefs outlining their respective positions. (Docs. 10 & 11.) For the reasons discussed below, the Commissioner's decision is due to be **AFFIRMED**.

## I. PROCEDURAL HISTORY

On March 5, 2004, Plaintiff filed an application for a period of disability and disability insurance benefits, alleging a disability onset date of February 6, 2004. (R. 73-75.) Plaintiff's application was denied initially and upon reconsideration. (R. 34-36, 41-43, 45-49.) Thereafter, Plaintiff timely pursued her administrative remedies available before the Commissioner and requested a hearing before an Administrative Law Judge ("ALJ"). (R. 38.) The ALJ conducted Plaintiff's administrative hearing on January 31, 2007. (R. 444-73.) The ALJ issued a decision unfavorable to Plaintiff on March 29, 2007. (R. 10-25.) Plaintiff's request for review of the hearing decision by the Social

Security Administration's Office of Hearings and Appeals was denied.  (R. 4-7.) Plaintiff

then appealed to this Court. (Doc. 1.)

## II. <u>STANDARD OF REVIEW</u>

The Commissioner's findings of fact are conclusive if supported by substantial

evidence.[1] Substantial evidence is more than a scintilla in that the evidence must do

more than merely "create a suspicion of the existence of [a] fact," and must include

"such relevant evidence as a reasonable person would accept as adequate to support

the conclusion."[2]

Where the Commissioner's decision is supported by substantial evidence, the

district court will affirm, even if the reviewer would have reached a contrary result as

finder of fact, and even if the reviewer finds that the evidence preponderates against the

Commissioner's decision.[3] The district court must view the evidence as a whole, taking

into account evidence favorable as well as unfavorable to the decision.[4] However, the

district court will reverse the Commissioner's decision on plenary review if the decision

applies incorrect law, or if the decision fails to provide the district court with sufficient

---

[1] *See* 42 U.S.C. § 405(g).

[2] <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing <u>Richardson v. Perales</u>, 402 U.S. 389, 401(1971); <u>Walden v. Schweiker</u>, 672 F.2d 835, 838 (11th Cir. 1982)); *accord* <u>Edwards v. Sullivan</u>, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] <u>Edwards</u>, 937 F.2d at 584 n.3; <u>Barnes v. Sullivan</u>, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] <u>Foote</u>, 67 F.3d at 1560; *accord* <u>Lowery v. Sullivan</u>, 979 F.2d 835, 837 (11th Cir. 1992) (holding court must scrutinize entire record to determine reasonableness of factual findings); <u>Parker v. Bowen</u>, 793 F.2d 1177 (11th Cir. 1986) (finding court must also consider evidence detracting from evidence on which Commissioner relied).

reasoning to determine that the Commissioner properly applied the law.[5]   The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8] First, if a claimant is working at a substantial gainful activity, she is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in Title 20, Part 404, Subpart P, Appendix 1 of the Code of Federal Regulations, she is disabled.[11] Fourth, if a claimant's impairments do

---

[5] Keeton v. Dep't Health & Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. See Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] Id. § 404.1520(c).

[11] Id. § 404.1520(d).

not prevent her from doing past relevant work, she is not disabled.[12] Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[17] In a situation where both exertional and non-exertional impairments are

---

[12] 20 C.F.R. § 404.1520(e).

[13] Id. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); see also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[15] Doughty, 245 F.3d at 1278 n.2.
In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.
Id. (internal citations omitted).

[16] Walker, 826 F.2d at 1002. Once the burden shifts to the Commissioner to show that the claimant can perform other work, the grids may come into play. Id.

[17] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996);Walker v. Bowen, 826 F.2d 996,
(continued...)

found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the grids as a framework to evaluate vocational factors so long as she introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[21]

## III. <u>SUMMARY OF THE RECORD EVIDENCE</u>

Plaintiff was fifty (50) years old at the time of the ALJ's decision on March 29, 2007. (R. 10-25, 73.) She has a high school education, a year of special job training,[22] and has previous work experience as an accounting supervisor. (R. 92.) Plaintiff contends that she has been unable to work since February 6, 2004, due to neck pain, headaches, carpal tunnel syndrome, and depression. (R. 44, 73.) Plaintiff is insured for benefits through December 31, 2009. (R. 60.)

---

[17](...continued)
1003 (11th Cir. 1987) ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[18] <u>Walker</u>, 826 F.2d at 1003.

[19] <u>Wolfe</u>, 86 F.3d at 1077-78.

[20] *See* <u>id</u>.

[21] *See* <u>Doughty v. Apfel</u>, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001).

[22] (R. 83.)

In her review of the record, including Plaintiff's testimony, medical records from several health care providers, and the testimony of a vocational expert, the ALJ determined that Plaintiff has the following severe impairments: arthritis, history of carpal tunnel syndrome, and cervical spondylosis. (R. 15.) The ALJ concluded that Plaintiff did *not* have a mental impairment which produced "limitations of incapacitating proportions." (R. 23.) Further, the ALJ determined that Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the impairments listed in Title 20, Part 404, Subpart P, Appendix 1 of the Code of Federal Regulations.

The ALJ then found that Plaintiff retained the RFC to perform less than the full range of light work. (R. 16-17, 24.) The ALJ found the Plaintiff has the residual functional capacity to lift up to twenty pounds; can stand, sit, and/or walk for up to six hours in an eight hour work day; and can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. The ALJ limited Plaintiff to never climbing ladders, ropes or scaffolding and to avoid repetitive assembly activity. After finding that Plaintiff could not perform her past relevant work as an accounting supervisor, the ALJ consulted a vocational expert ("VE"). (R. 23.)

Plaintiff's medical records document a long history of Plaintiff's complaints of chronic cervical pain and corresponding objective medical findings.  The record evidence also shows that Plaintiff has a history of bilateral carpal tunnel syndrome. Plaintiff sought treatment for her complaints of chronic cervical pain and carpal tunnel syndrome symptoms from her primary care providers as well as from multiple consulting examiners.

6

Dr. John Gaffney, Plaintiff's primary care physician between December 1988 and September 2004, diagnosed her with chronic cervical radiculopathy, chronic cervical spine pain, degenerative disc disease, degenerative joint disease, depression and carpal tunnel syndrome. Plaintiff's subjective complaints of chronic pain and Dr. Gaffney's observation of the reduced range of motion in Plaintiff's cervical spine prompted him to send Plaintiff for chiropractic treatment, consultative examinations, and diagnostic testing. (R. 216-66.)

Over the course of Plaintiff's medical treatment, appropriate diagnostic tests were conducted concerning her cervical pain. MRIs of Plaintiff's cervical spine conducted in May 1997, May 2002, and June 2004[23] revealed left-sided narrowing of the C5-C6 and C6-C7 neural foramina due to uncinate spurring with no evidence of spinal stenosis, cord compression, or disc herniation. (R. 381, 382, 384.) In April 2004, an incomplete set of x-rays of the cervical spine showed no abnormalities. (R. 383.) The most recent MRI of Plaintiff's cervical spine in August 2006 was consistent with previous MRIs but also revealed a disc bulge at C6-C7. (R. 392.)

Dr. David L. Hadley, of Shore Chiropractic Center, intermittently treated plaintiff for cervical and lumbar back pain between May 2002 and September 2004. (R. 294-327.)

Pursuant to Dr. Hadley's referral, Plaintiff saw Dr. Alan Turtz in March 2003 for a neurosurgical consultation. (R. 174.) Upon examination of Plaintiff, Dr. Turtz noted

---

[23] The June 2004 MRI also revealed sphenoid sinusitis—a condition occurring where there is inflammation of one or both of the sinuses located behind the sphenoid bone in the nasal cavity. DORLAND'S MEDICAL DICTIONARY (2007).

bilateral paracervical muscle tenderness in Plaintiff's lower cervical spine with no midline tenderness. Plaintiff demonstrated full range of motion with slight discomfort. Foraminal compression test and Lhermitte's sign[24] were both negative. Dr. Turtz reviewed Plaintiff's 2002 MRI results and found only mild degenerative changes with no evidence of neural compression. Following his examination of Plaintiff and review of her 2002 MRI results, Dr. Turtz opined that Plaintiff was not a candidate for surgery and recommended she get an EMG of her upper extremities. (R. 174-175.) An EMG study conducted on August 22, 2003 revealed subacute chronic mild to moderate bilateral carpal tunnel syndrome without cervical radiculopathy. (R. 177-178, 296).

Dr. Gaffney referred Plaintiff to Dr. A. Lee Osterman, a hand surgeon, for treatment of Plaintiff's complaints of pain, numbness, and tingling in her wrists, hands and fingers. Plaintiff saw Dr. Osterman multiple times between November 2003 and October 2004. (R. 275-94.) Physical examination of Plaintiff in November 2003 revealed a full range of motion in her shoulders with a slight loss of internal rotation in the right shoulder, a reduced range of motion in the wrists, and full range of motion of all digits bilaterally. Tinel's tests[25] were positive bilaterally. Dr. Osterman observed a decreased sensation to light touch bilaterally in the first three digits. After reviewing her EMG results, Dr. Osterman diagnosed Plaintiff with moderate carpal tunnel syndrome and recommended carpal tunnel release surgery. (R. 291-92.) In February 2004, Dr.

---

[24] A positive Lhermitte's sign occurs when flexion of the neck causes an electric shock type sensation to run down the spine. DORLAND'S MEDICAL DICTIONARY (2007).

[25] The Tinel's test is commonly used to detect carpal tunnel syndrome. *See* NAT'L INST. OF NEUROLOGICAL DISORDERS & STROKE, *Carpal Tunnel Syndrome Fact Sheet* (Nat'l Inst. Health, Pub. No. 03-4898, 2002); DORLAND'S MEDICAL DICTIONARY, *Tinel Sign* (2007).

Osterman performed a median nerve decompression and neurolysis of Plaintiff's right wrist. (R. 181-194, 214-15). During a post-surgical follow up examination in March 2004, Dr. Osterman noted residual numbness with shooting pain in Plaintiff's right hand and "significant problems relative to the cervical spine." (R. 285-86.) He recommended Plaintiff wait to undergo surgery of her left hand until her right hand had reached maximum medical improvement.

Pursuant to the Division of Disability Determination's request, Dr. Osterman and Dr. Gaffney both prepared medical assessment reports on behalf of Plaintiff. In Dr. Osterman's May 2004 report, he diagnosed Plaintiff with cervical osteoarthritis and bilateral carpal tunnel syndrome, and opined that due to Plaintiff's ongoing treatment for carpal tunnel syndrome, she was limited to lifting and carrying no more than five pounds and was incapable of doing repetitive assembly activity. He placed no limitations on her ability to stand, sit or walk. (R. 283-4.) In Dr. Gaffney's April 2004 report, he discussed Plaintiff's chronic neck pain, degenerative disc disease, degenerative joint disease and bilateral carpal tunnel syndrome. Dr. Gaffney identified impaired range of motion in Plaintiff's cervical spine, wrists and legs; decreased grip strength in Plaintiff's right hand; and bilateral upper extremity weakness. (R. 223-232). Accordingly, he declared Plaintiff "permanently disabled" and unable to perform simple routine activities at work or at home. (R. 220-222.) He further opined that Plaintiff was capable of lifting two pounds or less; capable of standing or walking less than 2 hours per day; unable to squat, walk on her heels, or toes; unable to walk at a reasonable pace; unable to sit for extended

periods of time due to her pain; and incapable of handling objects due to her carpal tunnel syndrome. (R. 228, 232.)

Dr. Gaffney's physical exam of Plaintiff in June 2004 revealed no neurological deficits. (R. 219.)

Dr. Gaffney and Dr. Osterman referred Plaintiff to Dr. Mitchell Freedman for a physiatric[26] consultation pursuant to her complaints of cervical pain. Plaintiff presented with complaints of chronic neck pain which did not radiate to her arms, and ongoing headaches. Plaintiff noted that her recent carpal tunnel release surgery had been very helpful in resolving the parasthesias in her fingers. Examination of Plaintiff revealed vasomotor function, gait and station were all normal. Cervical range of motion was limited and painful but Dr. Freedman did not observe any focal tenderness in her neck or back and Plaintiff's strength in her upper and lower extremities was intact. The Tinel's sign over Plaintiff's left carpal tunnel was benign. Dr. Freedman reviewed Plaintiff's 2002 and 2004 MRI results and 2004 x-ray results and diagnosed Plaintiff with cervical discomfort with cervical spondylosis, possible element of facet dysfunction, despondent and history of depression, status post right carpal tunnel release, and left carpal tunnel syndrome. He recommended left carpal tunnel release surgery, a pain management program, and a psychiatric consultation for depression. (R. 198-213.)

Dr. Osterman performed a left median nerve decompression in the left wrist on July 13, 2004. (R. 214-15). He noted Plaintiff stated "overall she [was] doing quite well"

---

[26] A physiatrist is a physician who specializes in physical therapy and rehabilitation. STEDMAN'S MEDICAL DICTIONARY 1493 (28th ed. 2006).

and that her symptoms have significantly improved on the left side. (R. 276.) Plaintiff complained of an increase in size in her right palm but did not complain of pain or parasthesias on that side. Physical examination revealed a full range of motion in her digits and wrist on the right side with palmar thickening at level of the distal palmar crease. Dr. Osterman's impression was Dupuytren's disease.[27] Examination of Plaintiff's left extremity revealed full range of motion in all digits, sensation and strength intact and a negative Tinel's sign. Dr. Osterman instructed Plaintiff to continue with range of motion and strengthening exercises at home and to return for reevaluation in four weeks. Dr. Osterman noted that Plaintiff would "be able to return to work in four weeks at light duty." (R. 276.) Plaintiff never returned for follow up with Dr. Osterman and in October 2004, he noted that his plan was for Plaintiff to return to work at light duty following her recovery from the July 2004 surgery on her left wrist. He opined that "as far as the relationship between the neck and the carpal tunnel, we have double crush mechanism."[28]

Dr. Hadley wrote a letter summarizing Plaintiff's status in September 2004 in preparation for Plaintiff's move to Florida. He opined that overall Plaintiff had progressed fairly well in response to chiropractic treatment. He noted a recent increase in Plaintiff's symptomatology which he attributed to her traveling as well as increased daily activities commensurate with her preparation for moving. (R. 296.)

---

[27] Dupuytren's disease is an abnormal thickening of the tissue just beneath the skin of the palm. Nat'l Inst. of Health, *Dupuytren's Contracture, in* MEDLINE PLUS MEDICAL ENCYCLOPEDIA (2008).

[28] (R. 274-75.) "Double crush" is a medical theory under which there is a probable association of neck injury with carpal tunnel syndrome such that where there is damage to nerves in the wrist, the nerves in the neck are sensitized to even minor compression. *See* VLADIMIR GOLOVCHINSKY, DOUBLE-CRUSH SYNDROME 89-90 (2000).

In September 2004, a non-examining state agency physician opined that Plaintiff was capable of frequently lifting up to ten pounds; occasionally lifting up to 20 pounds; standing, sitting, and walking for about six hours of an eight hour work day; limited gross manipulation handling; occasionally balancing, stooping, kneeling, crouching, and crawling; and never climbing ladders, ropes or scaffolds. He placed no limitations on her ability to push or pull, to climb ramps or stairs; or on her ability to engage in fine manipulation with her hands. The physician stated Plaintiff should "avoid repetitive assembly activity." (R. 337-44.)

Plaintiff reported for a consultative examination with Dr. Sidney Tobias at the request of her attorney in October 2004. Plaintiff complained that:

> as a result of constant and repetitive use of both hands and wrists . . . [and] turning her head from side to side . . . she [developed] pain and stiffness in her neck and upper back as well as pain and stiffness in both wrists and hands with numbness and tingling in the fingers of both hands.

(R. 332.) Physical examination revealed tenderness and spasm through her posterior and lateral cervical musculature, and trapezoid muscles bilaterally. Plaintiff demonstrated reduced and painful range of motion in the cervical spine as well as painful range of motion in her shoulder. Dr. Tobias also observed diffuse compression tenderness in Plaintiff's wrists bilaterally as well as a moderate loss of grip strength bilaterally. Based upon his examination of Plaintiff and review of her medical records, Dr. Tobias diagnosed Plaintiff with cervicodorsal sprain, degenerative osteoarthritis changes, chronic cervicodorsal myositis and fibromysositis, and bilateral carpal tunnel

syndrome. Based on his diagnoses, he assigned a permanent orthopedic disability of 37.5% of the cervical spine and 45% in both hands. (R. 331-36.)

Upon moving to Florida, Plaintiff initiated treatment with Dr. Eduardo Torres in December 2004. Dr. Torres diagnosed her with hypertension, dyslipidemia, fatigue, wheezing, major depressive disorder by history, osteoarthritis, tobacco abuse and mild exophthalmos. He prescribed Advair for her wheezing and ordered blood work and chest x-rays. He observed full range of motion in all of Plaintiff's major joints and noted that Plaintiff was "doing well." Plaintiff returned for a follow up visit in January 2005. Plaintiff denied having any acute problems.  Examination revealed Plaintiff's gait and stance were unremarkable, there were no gross motor or sensory deficits, her muscle strength was normal and symmetric and she once again demonstrated full range of motion in all major joints. Dr. Torres encouraged her to start aggressively engaging in a low impact exercise so as to promote weight loss and referred her to Dr. Ponnavolu D. Reddy, an orthopedic specialist, for treatment. (R. 347-54.)

Dr. Reddy saw Plaintiff for a consultative examination in January 2005. Plaintiff reported with complaints of long history of neck pain and pain in her upper extremities. Dr. Reddy noted that Plaintiff was capable of full unassisted weight-bearing ambulation. Examination revealed painless range of motion in the cervical spine. There was no deformity or tenderness in her thoracolumbar spine. Plaintiff's handgrip was "present and equal on both sides." Power and strength in her lower extremities was intact. Dr. Reddy reviewed Plaintiff's 2002 MRI which showed no cord compression. He took x-rays of Plaintiff's cervical spine during her office visit which showed no evidence of

subluxation or dislocation. Accordingly, he diagnosed Plaintiff with atlantoaxial arthritis and recommended several tests, including rheumatoid arthritis and gout tests. If the test results are negative, he recommended a spinal surgery consultation. If positive, he recommended a referral to a rheumatologist. (R. 345-346.)

Plaintiff began treatment with Dr. Darrell Pierce, a chiropractor, in January 2005. The progress note from her last visit in March 2005 reports that Plaintiff had full range of motion in her cervical spine and her upper back pain had improved. Plaintiff had pain and tenderness in her lower back and palpable active trigger points in upper trapezius, supraspinatus, and infraspinatus bilaterally. Dr. Pierce's impression was myofascial trigger point syndrome producing neck and upper back pain, and lumbar facet syndrome producing low back pain. (R. 355-64.)

A functional assessment report generated by a non-examining state agency physician in April 2005 was essentially consistent with the previous assessment rendered in September 2004 except for the assigned postural and manipulative limitations. Based upon his review of Dr. Torres' progress notes, the state agency physician updated Plaintiff's functional assessment and placed no limitations on Plaintiff's ability to climb, balance, stoop, kneel, crouch, crawl, reach, and engage in fine and gross manipulations. (R. 367-374.)

Dr. Torres referred Plaintiff to Stuart D. Patterson, an orthopedist specializing in the upper extremities, who examined plaintiff in May 2005. Plaintiff reported that overall, her symptoms had been better since her bilateral carpal tunnel surgeries. Examination

revealed negative Phalen's[29] and Tinel's results and normal range of motion in her digits, wrists, forearms, and elbows bilaterally. Dr. Patterson noted Plaintiff's motor strength was intact bilaterally and there was no muscle atrophy, wasting, or swelling in either hand. Dr. Patterson opined that her Dupuytren's disease was benign and she could use her hands "normally without restriction," but also noted that "[g]iven the length of time that has elapsed since her carpal tunnel surgery," he did not "anticipate any further improvement." (R. 385-87.)

Dr. Pierce prepared a medical assessment report on behalf of Plaintiff in July 2005 in which he assessed Plaintiff's functional limits based upon his diagnostic findings of foraminal compression. He opined that Plaintiff was capable of lifting and carrying up to ten pounds on a frequent or occasional basis; standing or walking less than two hours in an eight hour workday requiring a change in position after approximately ten to fifteen minutes; sitting for about 4 hours in an 8 hour workday requiring a change of position every fifteen minutes; and occasionally twisting, stooping, bending, and climbing stairs. According to Dr. Pierce, Plaintiff was incapable of crouching or climbing ladders, and should avoid all exposure to fumes, odors, dusts, gases, and extreme temperatures. He also placed limitations on her ability to engage in fine and gross manipulation with her hands and fingers. (R. 389-391.)

Dr. George Gilbert at the Express Care Clinic acted as Plaintiff's primary care provider from October 2005 through August 2006 and treated her for hypertension,

---

[29] In addition to the Tinel's sign, the Phalen's maneuver is also commonly used to detect carpal tunnel syndrome. *See* NAT'L INST. OF NEUROLOGICAL DISORDERS & STROKE, *Carpal Tunnel Syndrome Fact Sheet* (Nat'l Inst. Health, Pub. No. 03-4898, 2002); DORLAND'S MEDICAL DICTIONARY, *Phalen Maneuver* (2007).

mood disorder, fatty liver, chronic pain, and fatigue. (R. 420-42.) Dr. Gilbert observed reduced range of motion in Plaintiff's cervical spine during several examinations. (R. 420, 423, 428, 432) In an effort to treat her complaints of chronic neck pain, Dr. Gilbert referred Plaintiff to an orthopedist, psychiatrist, neurosurgeon, and physical therapist. (R. 420, 423, 425, 426, 428.) Dr. Gilbert consistently noted examination of Plaintiff's neurological system was within normal limits. (R. 425-30, 432.)

Plaintiff received physical therapy from June 2006 to July 2006 for treatment of her neck and low back pain. The therapist observed that bending induced back spasms with severe pain in the cervical area. (R. 417-418.)

A cervical MRI in August 2006 was consistent with Plaintiff's previous MRIs except for the additional finding of a mild central focal annular disc bulge at C6-C7. (R. 392.)

Dr. Gilbert completed a medical source statement in September 2006 in which he opined that Plaintiff was capable of occasionally lifting or carrying up to ten pounds; frequently lifting or carrying less than ten pounds; standing, sitting, or walking less than two hours during an eight hour work day requiring a change of position at least every five minutes; occasionally twisting, stooping or crouching. Plaintiff was incapable of climbing stairs or ladders, and may need to lie down during severe migraines. Dr. Gilbert further limited Plaintiff to avoid: tasks requiring extensive manipulation with her hands and fingers, all exposure to extreme temperatures, humidity and concentrated exposure to noise. His opinion was based upon Plaintiff's limited range of motion in her cervical spine and her abnormal MRI results. (R. 413-15.)

In addition to her chronic cervical pain and bilateral carpal tunnel syndrome, Plaintiff also has a history of depression. Even though she had been diagnosed with stress, anxiety and depression as early as May 2002, Plaintiff did not report to a mental health care provider for treatment[30] until October 2005. (R. 241, 406-10.) Plaintiff has been taking Zoloft for treatment of her symptoms since her family doctor prescribed it in May 2002. (R. 241.) In October 2005, Dr. Gilbert increased the dosage from 100 mg to 150 mg per day and referred Plaintiff to Dr. Mery Lossada, a neurologist-psychiatrist. (R. 432.)

Plaintiff presented to Dr. Lossada for initial examination and treatment in October 2005 with complaints of sadness for over a year. Plaintiff also reported irritability, social withdrawal, difficulty sleeping, and low energy level. Dr. Lossada noted that basic physical examination was normal. Neurological and mental status exams revealed normal speech, memory, thought process and judgment. Plaintiff denied any suicidal or homicidal ideation. While Dr. Lossada observed that Plaintiff's mood and affect were anxious, she also noted that Plaintiff's global assessment of functioning score was 95 suggesting Plaintiff was operating at a superior level of functioning despite her

---

[30] Plaintiff saw mental health care providers multiple times between June 2004 and May 2005 for the purpose of consultative examinations only. (R. 196-97, 328-30, 365-66.)

complaints.[31] Dr. Lossada diagnosed Plaintiff with chronic pain syndrome, prescribed Elavil, and referred her to a pain management specialist.[32]

Plaintiff returned for a follow up visit in November 2005 with complaints of interrupted sleep. Plaintiff reported that she stopped taking the medications Dr. Lossada prescribed due to the side effects. Examination of Plaintiff's mental status revealed Plaintiff was alert and oriented and demonstrated good insight and judgment. Plaintiff's mood was anxious. Diagnosis was major depression recurrent secondary to insomnia. Dr. Lossada prescribed Trazadone and Zoloft and instructed Plaintiff to return in eight weeks. (R. 406.) Plaintiff does not appear to have returned for additional treatment since then.

During an office visit with Dr. Gilbert in June 2006, Plaintiff reported that "she was doing very well in regards to her mood disorder." (R. 426.)

With respect to Plaintiff's consultative examinations, all three examiners found that while Plaintiff presented as depressed and anxious, mental examination revealed that she was alert and oriented, had adequate concentration, and her memory, judgment, and insight were intact. (R. 195-97, 330, 365-66.) Additionally, in June 2004,

---

[31] The "global assessment of functioning" is rated on a scale of 0 to 100 and is used by mental health care providers to report their judgment of an individual's overall level of functioning with respect to the individual's psychological, social, and occupational functioning without regard for impairments in functioning due to physical limitations. A person whose score falls between 91 and 100 is described as having "superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of [her] many positive qualities. No symptoms." AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32, 34 (4th ed. 2000).

[32] (R. 407-10.) A "pain disorder" is a type of somatoform disorder. "The common feature of . . . [s]omatoform [d]isorders is the presence of physical symptoms that suggest a general medical condition . . . and are not fully explained by a general medical condition." AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 485 (4th ed. 2000).

Dr. David M. Watral observed no evidence of a thought disorder and noted that Plaintiff's working attention span was adequate. (R. 195-97.) In October 2004, Dr. Edward H. Tobe noted that "now for the first time, [Plaintiff] was feeling good about herself." (R. 330.)

In September 2004 and then again in May 2005, state agency non-examining physicians reviewed Plaintiff's medical records and completed a Psychiatric Review Technique form (PRTF) assessing the severity of the functional limitations arising from Plaintiff's depression. In 2004, the state agency non-examining physician opined that Plaintiff was moderately limited in maintaining concentration, persistence or pace and mildly restricted in her activities of daily living and in her ability to maintain social functioning. (R. 267-70.) Accordingly, he also performed a mental residual functional capacity assessment in which he found Plaintiff was moderately limited in her ability to: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to respond appropriately to changes in the work setting. He commented that Plaintiff's "activities of daily living [were] not significantly limited by mental factors" and opined that Plaintiff "retain[ed] the ability to understand, remember, follow simple instructions, make simple decisions, adapt, and interact with others in a low demand work setting." (R. 267-73.)

In 2005, the state agency non-examining physician completed a PRTF in which she found Plaintiff was mildly restricted in her activities of daily living and mildly limited

19

in her ability to maintain social functioning, and maintain concentration, persistence or pace. (R. 375-379.) In sum, both physicians concluded that Plaintiff did not have a disabling mental impairment.

## IV.  DISCUSSION

Plaintiff raises several issues on appeal. First, Plaintiff argues that the ALJ erred by failing to find a "severe" mental impairment. Secondly, Plaintiff contends that the ALJ erred by rejecting Plaintiff's credibility. Third, the Plaintiff argues that the ALJ erred by rejecting the opinions of several treating physicians concerning Plaintiff's hand and cervical impairments. Lastly, Plaintiff contends that the hypothetical posed to the vocational expert was defective because it was based upon a defective RFC.

**A.     The ALJ's Finding That Plaintiff Does Not Have A Severe Mental Impairment Is Supported By Substantial Evidence**

Plaintiff contends that the ALJ erred in finding that she did not have a severe mental impairment. Relying upon medical evidence from (1)  Dr. Lossada, who diagnosed Plaintiff with pain syndrome, (2) Dr. Watral, who diagnosed Plaintiff with depression associated with pain syndrome, and (3) Dr. Tobe, who stated that "there is a 50% permanent total psychiatric disability," Plaintiff argues that there was more than sufficient evidence to establish that Plaintiff's mental impairments had more than a minimal effect upon Plaintiff's work abilities. The Court disagrees.

At step two of the sequential evaluation an impairment is severe if it significantly limits an individual's physical or mental ability to perform basic work activities.[33] When considering a claimant's mental ability to perform basic work activities the ALJ should consider the claimant's capacity for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; using judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting.[34] It is the functional limitation from an impairment that is important and not merely whether a condition has been diagnosed.

Turning first to Dr. Lossada, other than including a diagnosis of pain syndrome, her reports from the examinations of Plaintiff on October 31, 2005 and November 28, 2005 fail to disclose any functional limitations that could be considered severe or that would limit Plaintiff's ability to perform basic work activities. The records from the October 31 and November 28, 2005 examinations disclose that Plaintiff was alert, and oriented to time, place, and person with normal speech, memory, thought processes, and that she had good judgment and insight. (R. 406, 410.) Indeed, other than noting a diagnosis of depression secondary to Plaintiff's insomnia and pain syndrome, there is nothing in the reports which is remarkable or suggests that Plaintiff's depression causes any type of functional limitation. This assessment is further confirmed by Dr. Lossada's opinion of Plaintiff's global assessment of functioning ("GAF"). In her report of the October 31, 2005 consultation, Dr. Lossada concluded that Plaintiff had a GAF score of

---

[33] 20 C.F.R. §§ 404.1520(c); 404.1521(a).

[34] 20 C.F.R. § 404.1521(b).

95 - which according to the *Diagnostic and Statistical Manual of Mental Disorders* - means that the "individual has superior functioning in a wide range of activities," the individual does not let " life's problems ... get out of hand," and generally the individual does not have any symptoms. Thus, according to the rating by Dr. Lossada, Plaintiff was considered to have a superior level of functioning psychologically, socially and occupationally. Simply stated an individual with a GAF of 95 does not have issues with regard to mental functioning, which would impact the individual's ability to engage in the mental demands of basic work activities.  The ALJ expressly relied upon this assessment by Dr. Lossada as part of her finding that Plaintiff did not have a severe mental impairment.

Plaintiff also points to the medical report from Dr. Tobe in support of her argument that the ALJ erred in assessing Plaintiff's mental impairments. Dr. Tobe, a one-time consultative examiner, saw Plaintiff on October 20, 2004 and without making any clinical findings and solely based upon Plaintiff's self reported history, Dr. Tobe assigned a "50% permanent total psychiatric disability." (R. 330.) The ALJ specifically addressed the report from Dr. Tobe  and accorded it little weight because it was not supported by Dr. Tobe's own records and was radically inconsistent with the other evidence of record, including the GAF of 95 assigned by Dr. Lossada, and the psychological evaluation by Dr. Watral, whose report of mental status did not show any significant findings.  Moreover, Dr. Tobe found that Plaintiff's memory, judgment and reality testing were generally intact, and other than his statement about a permanent total psychiatric disability, there were no clinical findings or anything in the report that

22

would suggest Plaintiff's mental functioning was limited.  Because Dr. Tobe was a one-time examining physician the ALJ was not required to give his opinion controlling weight and was entitled to accord it the same weight as the opinions of Dr. Lossada and Dr. Wastral.

Lastly, the ALJ did not, as argued by Plaintiff, "ignore the fact that Dr. Watral diagnosed depression associated with a pain syndrome." To the contrary the ALJ expressly discussed the examination by Dr. Watral and based his finding on many of the clinical findings contained in Dr. Watral's consultative psychological evaluation of Plaintiff in June 2004. In particular the ALJ relied upon the fact that the mental status exam by Dr. Watral did not show any evidence of thought disorder and evidenced that the Plaintiff's long term memory, attention span and ability to use mathematical skills were not impaired.  Again, other than a diagnosis of depression as a result of her medical condition, the report from Dr. Watral did not contain any evidence that Plaintiff had mental functional limitations, which would prevent her from engaging in basic work skills.

The ALJ reviewed and discussed this evidence and, because there was no evidence of significant findings regarding Plaintiff's mental status, the ALJ concurred with Dr. Deborah Carter, the state agency doctor who reviewed the record on May 18, 2005 (with the benefit of all of the medical records) and who concluded that because Plaintiff did not have any mental limitations she did not have a severe mental impairment. Accordingly, the ALJ applied the correct legal standards and based her

conclusion that Plaintiff did not have a severe mental impairment upon the medical evidence of record.

**B.     The ALJ Did Not Err In Finding That Plaintiff's Testimony Was Only Partially Credible**

The Plaintiff contends that the ALJ erred in his credibility finding because she did not examine all of the evidence. In evaluating a disability, the ALJ must consider all of a claimant's impairments, including her subjective symptoms, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.[35]  Where, as here, an ALJ decides not to credit a claimant's testimony about subjective complaints concerning the intensity, persistence and limiting effects of symptoms, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.[36]  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.[37]

In evaluating the credibility of Plaintiff's testimony as to the intensity, persistence and limiting effects of her symptoms, the ALJ specifically discussed and relied upon the medical records from Dr. Reddy and Dr. Patterson, each of whom made clinical findings and reviewed diagnostic test results, which did not support the limiting effect of the

---

[35] 20 C.F.R. § 404.1528.

[36] Foote, 67 F.3d at 1561-62; Jones v. Department of Health and Human Servs., 941 F.2d 1529, 1532 (11th Cir. 1991) (finding that articulated reasons must be based on substantial evidence).

[37] Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986).

symptoms to the extent alleged by Plaintiff.  For example, both Dr. Patterson and Dr.

Reddy found no indication that Plaintiff's bilateral carpal tunnel syndrome continued to

limit her ability to use her hands. Dr. Patterson went so far as to note in his records that

Plaintiff could use her hands "without restrictions."

With respect to Plaintiff's complaints of chronic pain, the ALJ also addressed and

relied upon the MRI's and x-rays, which demonstrated only a mild condition, and did not

support the "extreme" opinions of some of Plaintiff's physicians.

In further assessing Plaintiff's credibility and consistent with the requirements of

SSR 96-7p,[38] the ALJ appropriately discussed Plaintiff's activities and treatment.  The

ALJ noted that Plaintiff lived a fully functional lifestyle.  She was capable of driving, light

housekeeping, preparing light meals, visiting with family, and watching television.

Progress notes from some of Plaintiff's physicians significantly made note of her hobby

of riding motorcycles, an activity which is completely at odds with Plaintiff's self reported

limiting effects of her symptoms and pain.  (R. 292.) In addition, her chiropractor noted

she was capable of sitting at a concert for several hours, which again is an activity

inconsistent with Plaintiff's complaints that she could sit for only ten minutes and must

lie down most of the day.  (R. 360.)

---

[38] In addition to the objective medical evidence, when assessing the credibility of an individual's statement, the adjudicator must consider, the individual's daily activities; location, duration, frequency and intensity of the pain or symptoms; factors that aggravate the symptoms; effectiveness and side effects of medication to alleviate the pain or symptoms; treatment; any measures the individual uses to relieve pain or symptoms; and any other factors concerning the individual's functional limitations due to pain or other symptoms. SSR 96-7p.

25

Plaintiff argues that the consistency in her statements concerning pain and limited physical/mental functioning, her multiple prescription medications, and her repeated attempts to get medical treatment bolster her credibility. However, the ALJ did not reject Plaintiff's subjective testimony in its entirety.  Instead, the ALJ acknowledged that Plaintiff's impairments *could* produce pain and limitations—just not of the severity claimed by Plaintiff. As such, the ALJ took into account Plaintiff impairments and found that consistent with the medical evidence her impairments would limit her in her ability to engage in heavy lifting but that Plaintiff's complaints of incapacitating limitations from her pain and impairments were not credible because they were not supported by the clinical findings in the medical records.

In sum, the ALJ determined that Plaintiff's combined activities of daily living were inconsistent with Plaintiff's allegations of incapacitating limitations and pain. Accordingly, for these reasons, the Court concludes that the ALJ articulated specific and adequate reasons, which are fully supported by the evidence of record, for  finding that Plaintiff's subjective complaints were not fully credible.

**C.    The ALJ Did Not Err In Evaluating the Opinions of Plaintiff's Treating Physicians Concerning Hand And Cervical Impairments**

Plaintiff challenges the ALJ's evaluation of the effects of carpal tunnel syndrome and cervical impairments on her ability to work.  In particular, the Plaintiff objects to the ALJ's treatment of the medical opinions of Dr. Reddy, Dr. Patterson, and Dr. Osterman and further argues that the ALJ improperly rejected the medical opinions of Dr. Gaffney,

Dr. Tobe, Dr. Tobias, Dr. Gilbert, and Dr. Pierce in assessing the functional limitations arising from Plaintiff's impairments.

Substantial or considerable weight must be given to the opinion, diagnosis, and medical evidence of a *treating physician* absent a showing of "good cause" to the contrary.[39] A treating physician's opinion on the nature and severity of a claimant's impairments is to be given controlling weight where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record.[40] Conclusory statements are entitled to only such weight as can be supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.[41]

Turning first to hand limitations, the Plaintiff argues that the ALJ erred in finding that the only limitation on Plaintiff's ability to use her hands was to avoid repetitive assembly work. Plaintiff contends that the ALJ erred in reaching this conclusion because she rejected the opinions of Dr. Gaffney and Dr. Pierce and instead relied upon the opinions of Drs. Reddy and Patterson. The Court disagrees.

With regard to Dr. Pierce, the ALJ properly gave little weight to the opinion of Dr. Pierce in view of the fact that he is a chiropractor—and not an "acceptable medical

---

[39] Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1159 (11th Cir. 2004); O'Neal v. Astrue, 5:07-cv-143-Oc-10GRJ, 2008 WL 2439885, at *3 (M.D. Fla. June 13, 2008); *see also* 20 C.F.R. § 404.1527(d) (describing the manner in which the ALJ is to evaluate medical evidence).

[40] 20 C.F.R. § 404.1527(d)(2).

[41] Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir.1986); *see also* Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987).

source."[42]  Furthermore, Dr. Pierce's own records do not support his view that Plaintiff would be restricted in her ability to handle (gross manipulation) and to finger (fine manipulation) to a disabling degree. There are no clinical findings in Dr. Pierce's records remotely connected to the Plaintiff's ability to handle or finger. The focus of Dr. Pierce's treatment was on Plaintiff's cervical and back issues.

With respect to Dr. Gaffney the ALJ explained that she gave less weight to his opinion because his opinion was not supported by the other objective medical evidence. For example, Dr. Gaffney's opinion is contradicted by the opinion of Dr. Stuart Patterson, an othopaedic surgeon, who conducted an extensive examination of Plaintiff's abilities to use her hands and wrists, and found no abnormalities.[43] Notably, based upon the unremarkable findings from his examination, Dr. Patterson concluded that Plaintiff could use her hands normally without any restrictions.[44] Moreover, Dr. Patterson concluded that Plaintiff could use her hands normally without any restrictions even though Dr. Patterson diagnosed Plaintiff with Dupuytren's disease (a thickening of the tissue beneath the skin in the palm of the hand) and despite the fact that Dr. Patterson noted that Plaintiff had bilateral post-operative hand pain.

---

[42] *See* 20 C.F.R. § 404.1513.

[43] Dr. Patterson's report discloses the following results of the examination:
> Positive two-point discrimination is 4 mm in all digits in both hands. She has normal intrinsic and extrinsic motor strength in both hands measuring 5/5/ MRC grade. She has a good radial pulse bilaterally wit good digital perfusion to all digits. Normal range of motion digits, wrist, forearm, and elbow bilaterally. She has no A1 pulley tenderness, no digital triggering. No first extensor compartment tenderness, and a negative Finkelstein test. No medial or lateral epicondylar tenderness and negative provocative testing for medial and lateral epicondylitis. There is no crepitus with digital fexion and extension nor wrist palmar or dorsiflexion. No evidence of inercarpal instability and no distal radioulnar joint instability. (R. 386.)

[44] R. 387.

The ALJ also pointed to other medical evidence that contradicted the opinion of Dr. Gaffney. For example, the medical records from Dr. Lee Osterman - who performed surgery on Plaintiff's right and left wrists - are not consistent with the opinions of Dr. Gaffney. After conducting surgery on Plaintiff's right wrist in February 2004 and surgery on her left wrist in July 2004, the progress notes from Dr. Osterman document continued improvement, a lessening of numbness and tingling, and in the right wrist, negative test results for the Tinel and Phalen tests, both of which are clinical tests for carpal tunnel syndrome. Indeed, after the last surgery Dr. Osterman noted that Plaintiff would be able to return to light duty in about four weeks. Dr. Osterman did restrict Plaintiff from repetitive assembly work, which the ALJ adopted and included in his RFC.

Accordingly, with regard to Plaintiff's carpal tunnel syndrome, while Dr. Gaffney was of the view that Plaintiff had severe functional limitations from her carpal tunnel syndrome, his opinion was internally inconsistent with his own records,[45] and as noted by the ALJ, the opinion was completely at odds with the other medical evidence including but not limited to the objective medical evidence from Drs. Patterson and Osterman. For these reasons, the Court concludes that the ALJ did not err with regard to the ALJ's evaluation of Plaintiff's RFC as it relates to Plaintiff's hand impairments.

Nor did the ALJ err with regard to his assessment of Plaintiff's RFC as it relates to Plaintiff's cervical impairments. Plaintiff argues that the ALJ improperly rejected the opinions of Drs. Tobias, Tobe, Gilbert and Pierce, who opined that Plaintiff could not

---

[45] The limitations noted by Dr. Gaffney were made during examinations of the Plaintiff and focused upon one of Plaintiff's wrists and during the time period between Plaintiff's surgeries on her left and right wrists. While this fact alone is not a reason to reject his opinion, it does underscore the fact that Dr. Gaffney was not in the same position as Dr. Osterman who examined the Plaintiff after both surgeries.

perform the exertional demands of sedentary work. As an initial matter, Dr. Tobe and Dr. Tobias were consultative examining physicians and therefore their opinions are generally not entitled to the same weight as a treating physician's opinion. Thus, in her evaluation of the limitations associated with Plaintiff's cervical complaints,

the ALJ was justified in according greater weight to the opinions of consultative examining physicians Dr. Reddy and Dr. Patterson because, unlike Dr. Tobe and Dr. Tobias, they are specialists in orthopedic medicine.[46]

With regard to Dr. Gilbert, one of Plaintiff's treating physicians, Dr. Gilbert opined that Plaintiff could lift and carry ten pounds occasionally and less than ten pounds frequently as well as sit, stand, or walk for less than two hours each in an eight-hour workday. (R. 413.)  The ALJ did not follow this assessment primarily because the medical records from Dr. Gilbert did not contain objective clinical findings that support this view. For the most part Dr. Gilbert's records document Plaintiff's self reported complaints of pain in her neck but do not include objective clinical evidence consistent with the complaints.  While Dr. Gilbert did note on examination reduced range of motion in Plaintiff's neck, there are no other clinical findings consistent with his view of Plaintiff's limitations.

Dr. Gilbert's view of Plaintiff's restrictions stand in stark contrast to the evaluation by Dr. Reddy and Dr. Gilbert's view is not supported by the MRI's and x-rays. Dr. Reddy conducted an orthopaedic evaluation of Plaintiff in January 2005. Dr. Reddy noted that

---

[46] Where a physician is not a treating physician, the ALJ may consider other factors, such as a physician's specialty in assessing the weight to be given to a particular medical opinion. 20 C.F.R. § 404.1527(d)(2).

Plaintiff was able to ambulate with full weight bearing on both lower extremities and that there was no need for an assistive device. Notably, the examination of Plaintiff's cervical spine revealed that on flexion and extension there was no evidence of pain. There was no evidence of deformity and no tenderness in the Plaintiff's thoracolumbar spine. The Plaintiff had full extremity power of 5/5 in her lower extremities. Notably, Dr. Reddy reviewed an MRI and x-rays that Plaintiff brought with her to the examination, which did not reveal any evidence of cord compression or any evidence of subluxation or dislocation. The ALJ expressly relied upon the lack of clinical evidence, as documented in Dr. Reddy's examination, and the fact that the MRI's and x-rays did not evidence the level of disabling limitations, as the reasons he did not adopting Dr. Gilbert's view. Because the ALJ thoroughly discussed the medical evidence and articulated specific reasons, which are fully supported by the evidence in the record, for not adopting the opinion of Dr. Gilbert the Court concludes that there was not reversible error.

Lastly, with regard to Dr. Sidney Tobias, he was a one-time examiner, who examined Plaintiff at the request of her lawyer. While his opinion is entitled to consideration it does not have controlling weight. While Dr. Tobias did found evidence of reduced range of motion and evidence of tenderness and muscle spasms in the cervical spine, Dr. Tobias did not include any specific physical restrictions or limitations as to standing, walking, sitting or the ability to engage in the exertional demands of work. Moreover, Dr. Tobias' examination was conducted on October 21, 2004 and thus took place within the general time frame when Dr. Reddy, Dr. Patterson and other physicians had examined Plaintiff. As discussed above, the findings by Dr. Reddy and Dr.

Patterson, as well as the results of the MRI and x-rays conflict with Dr. Tobias. Because Dr. Tobais was a one-time examiner the ALJ was not required to follow his findings and was entitled to weigh his findings against the other medical evidence of record. It is not the function of this Court in reviewing a decision of an ALJ to second guess the ALJ's conclusion. Nor is it appropriate for this Court to simply substitute its own judgment for that of the ALJ. Rather, the Court's limited task is to ensure that the ALJ evaluated the case based upon the appropriate legal principles and that the ALJ based her decision upon substantial evidence of record. Simply because an ALJ decides to follow the medical opinion of one physician over the opinion of another - when both are entitled to the same weight - is not a sufficient reason to reverse the decision of the ALJ.  In sum, because the Court concludes that substantial evidence of record - which was thoroughly discussed by the ALJ - supports the decision of the ALJ the decision is due to be affirmed.

Plaintiff's last argument on appeal is that the ALJ erred in relying upon VE testimony based upon a hypothetical which included a defective RFC. The Court need not address this argument because it is based upon the same objections to the ALJ's evaluation of Plaintiff's RFC discussed above. Because the Court concludes that the ALJ did not err in formulating the Plaintiff's RFC and the ALJ included all of the limitations adopted by her in her RFC finding, there was no error in the hypothetical and

32

therefore the opinion of the VE constitutes substantial evidence supporting the finding of

not disabled. [47]

## V.  **CONCLUSION**

In view of the foregoing, it is hereby **ORDERED** that the decision of the

Commissioner is **AFFIRMED**. The Clerk is directed to enter judgment accordingly and

close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on September 26, 2008.

_____
GARY R. JONES
United States Magistrate Judge

Copies to:

All Counsel

---

[47] Plaintiff also contends that the ALJ ignored the requirements of SSR 96-8P in determining Plaintiff's RFC. This argument has no merit.

Social Security Ruling 96-8p provides that the RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific material facts and non-medical evidence. The ALJ must also discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.   A "regular and continuing basis" means eight hours a day, five days a week, or the equivalent work schedule.

Contrary to Plaintiff's argument, the ALJ specifically found that Plaintiff had the ability to lift up to twenty pounds; to stand, sit, and/or walk for up to six hours in an eight hour work day; and to occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and/or crawl. Further, the ALJ found Plaintiff was to avoid repetitive assembly activity. The ALJ's written decision included a thorough summary of the relevant portions of Plaintiff's medical records. It is, therefore, abundantly clear that the ALJ considered Plaintiff's ability to work throughout an eight hour day and considered Plaintiff's ability to work longitudinally over a regular and continuous period of time.